AO 91 (Rev. 11/11) Criminal Complaint     AUSA Saqib Mohammad Hussain (312) 353-1414

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

FILED
2/19/2026
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

| | |
|---|---|
| UNITED STATES OF AMERICA | CASE NUMBER: 26 CR 66 |
| v. | |
| EDWIN MORENO, also known as "AK" | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about January 15, 2026, at Joliet, in the Northern District of Illinois, Eastern Division, and elsewhere, defendant violated:

| *Code Section* | *Offense Description* |
|---|---|
| Title 18, United States Code, Section 922(o) | possession of a machinegun |

This criminal complaint is based upon these facts:

  X   Continued on the attached sheet.

*Daniel Domke*
DANIEL DOMKE
Special Agent, Bureau of Alcohol, Tobacco, Firearms & Explosives (ATF)

Pursuant to Fed. R. Crim. P. 4.1, this Complaint is presented by reliable electronic means. The above-named agent provided a sworn statement attesting to the truth of the Complaint and Affidavit by telephone.

Date: February 19, 2026

*Laura K. McNally*
*Judge's signature*

City and state: Chicago, Illinois

LAURA K. MCNALLY
U.S. Magistrate Judge
*Printed name and title*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

## AFFIDAVIT

I, DANIEL DOMKE, being duly sworn, state as follows:

1. I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms & Explosives (ATF), and have been so employed since December 2022. My current responsibilities include the investigation of federal firearms offenses, including the unlawful possession of firearms or ammunition by convicted felons, firearms and narcotics trafficking, and violent crime.

2. I received approximately twenty-six weeks of criminal investigative training from the Federal Law Enforcement Training Center (FLETC) in Glynco, Georgia and graduated from the Criminal Investigator Training Program (CITP) and ATF Special Agent Training (SABT). I have also participated in investigations which used confidential sources and undercover officers, physical surveillance, electronic surveillance, the execution of search and arrest warrants on both physical and digital environments, including the use of court-ordered intercepts of wire and/or electronic communications, dialed number recorders (pen registers), telephone toll analysis, the arrests of drug traffickers, and the analysis of seized records, physical evidence, and taped conversations. These investigations have involved one, or all, of the following crimes: possession, distribution, possession with intent to distribute, and manufacture of controlled substances, and related laundering of monetary instruments. I have also spoken with confidential informants who have extensive

knowledge of the inner workings of major narcotics trafficking organizations. Through these investigations and training, I am familiar with the operations of drug trafficking organizations in the United States.

3. The facts set forth in this affidavit are based on my personal knowledge, my training and experience, information provided to me by other law enforcement personnel, review of consensual recordings, and physical surveillance. The investigation to date has included the use of consensually recorded telephone and in-person conversations. The summaries of recorded conversations in this affidavit do not include reference to all the topics covered during the conversations. Quoted material from the recorded conversations as set forth in this affidavit is taken from draft summaries, not final transcripts. In certain instances, conversations are summarized and placed in context, and my interpretations of the conversations are included in brackets. My understanding and interpretation of these conversations is based upon by the contents and context of the conversations, my familiarity with the facts and circumstances of this investigation, my experience as a law enforcement officer, my discussions with other law enforcement officers, the experience of other law enforcement agents and officers in this investigation, and other evidence developed during the course of the investigation.

4. This affidavit is submitted in support of a criminal complaint alleging that Edwin MORENO, also known as "AK" has violated Title 18, United States Code, Section 922(o) (possession of a machinegun) (the "**Subject Offense**"). Because this affidavit is being submitted for the limited purpose of establishing probable cause in

support of a criminal complaint charging MORENO with violating the **Subject Offense**, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to believe that the defendant committed the offense alleged in the complaint.

5. This affidavit is based on my personal knowledge, my training and experience, my review of audio and audio-video recorded conversations, law enforcement records and reports, court documents, as well as other information provided to me by other law enforcement agents and confidential sources.

**A. Summary**

6. As detailed below, in or around January 2026 and continuing to in or around February 2026, law enforcement began investigating Co-Conspirator 1 for firearms trafficking in or around the Chicagoland area based on information provided by a confidential source. As part of the investigation, on or about January 15, 2026, Co-Conspirator 1 and MORENO agreed to keep lookout for two individuals who they believed to be tow operators conducting a vehicle repossession, but, who unbeknownst to Co-Conspirator 1 and MORENO, were undercover law enforcement officers (hereinafter, "UCO-1" and "UCO-2").

7. On or about January 15, 2026, during a purported repossession, MORENO possessed a Glock, model 21, caliber .45, pistol, bearing serial number

NVK677 with an affixed machinegun conversion device ("MCD") and extended magazine.[1]

8. On or about February 18, 2026, MORENO was placed in custody and admitted that he knew that an MCD affixed to a semi-automatic firearm enabled the firearm to fire multiple rounds of ammunition with a single pull of the trigger and admitted to possessing the Glock pistol with the affixed gold-colored MCD on or about January 15, 2026.

**B. January 15, 2026: MORENO possessed a Glock pistol with an MCD affixed.**

9. On or about January 14, 2026, at approximately 8:56 p.m., UCO-2 placed a recorded call to a phone number ending in -2922 (hereinafter, "Co-Conspirator 1's Phone").[2] A male voice, who law enforcement identified as Co-Conspirator 1, answered. UCO-2 asked whether Co-Conspirator 1 could help UCO-2 with providing security while UCO-2 repossessed a vehicle. Co-Conspirator 1, replied "throw me a time and I'm there."[3] UCO-2 told Co-Conspirator 1 that he would need

---

[1] Based on my training and experience and the training and experience of other law enforcement officers familiar with firearms and firearms trafficking, I know that an MCD converts a semi-automatic firearm into an fully automatic firearm capable of firing multiple rounds of ammunition with a single trigger function.

[2] This affidavit refers to Co-Conspirator 1 as the identified user of phone number ending in -2922 based upon (1) T-Mobile records, which list Co-Conspirator 1 as the subscriber (2) Co-Conspirator 1 selling firearms of the same type for the same price that the user of Co-Conspirator 1's Phone agreed to sell UCO-1 prior the January 12, January 15, and February 6, 2026 controlled sales, and (3) law enforcements' review and comparison of recorded phone calls between UCO-1 and the male voice on Co-Conspirator 1's Phone and Co-Conspirator 1's voice during audio-video recorded, in-person, controlled purchases between UCO-1 and Co-Conspirator 1 during the controlled sales referenced above.

[3] Certain text message and phone conversations referenced in this affidavit have been recorded and preserved. This affidavit does not notate every communication between Co-Conspirator 1, MORENO, and the UCOs. Instead, the conversations are summaries of the

Co-Conspirator 1 tomorrow (January 15, 2026) and would let Co-Conspirator 1 know the time and location. The call ended.

10. Following the call, at approximately 10:07 p.m., Co-Conspirator 1's Phone messaged UCO-2, "I'm on point cuzo just let me know what time and exactly where would you want me to meet and I'll be there." Based on my training and experience and the training and experience of other law enforcement officers familiar with investigating firearms trafficking, and based on my familiarity with the investigation, I believe Co-Conspirator 1's message provided confirmation that Co-Conspirator 1 would meet UCO-2 on January 15, 2026, to provide security while UCO-2 repossessed a vehicle.

11. On January 15, 2026, at approximately 1:27 p.m., UCO-2 messaged Co-Conspirator 1's Phone 1, the meeting location at Restaurant A in Summit, Illinois. Co-Conspirator 1 replied via text message, "Bet 20 minutes."

12. According to law enforcement officers conducting surveillance in the area of Restaurant A, at approximately 2:01 p.m., a black colored Lincoln SUV drove into the Restaurant A's parking lot and parked next to an undercover law enforcement vehicle (the "UCV"). UCO-1 and UCO-2 exited the UCV wearing

---

communication. Where recorded conversations are discussed in this affidavit, the language that is quoted from the recorded conversations is based upon a preliminary review of the recorded conversations and not on final transcripts of the recorded conversations. Summaries and excerpts do not include all statements or topics covered during the course of the conversations. At various points in the affidavit, I have also included, either in brackets or summary form, my interpretation of words and phrases used in conversations. My interpretations are based on the contents and context of the conversations, events occurring before and after the conversations, my knowledge of the investigation as a whole, my experience and training, and the experience and training of other law enforcement agents in this investigation.

concealed, audio-video recording equipment and approached the driver's side door of the Lincoln SUV.

13. The UCOs identified Co-Conspirator 1 based on a Co-Conspirator 1 matching the physical appearance of Co-Conspirator 1's driver's license photograph on file with the Illinois Secretary or State. The UCOs also observed a distinct tattoo on Co-Conspirator 1's right hand, which matched a known description of Co-Conspirator 1 on file with the Chicago Police Department.

14. According to law enforcement reports and the audio-video recording, the followed occurred after the UCOs approached the driver's side door of the Lincoln SUV:

    a. Co-Conspirator 1 rolled down the driver's side window.

    b. UCOs observed a Hispanic male in the passenger seat, later identified as Edwin MORENO. MORENO wore a mask that covered the lower half of his face.

    c. Co-Conspirator 1 introduced MORENO as Co-Conspirator 1's "cousin."

    d. UCO-1 observed a Draco-style pistol with a wooden grip and extended magazine on MORENO's lap.

    e. UCO-1 observed a Glock pistol affixed with a gold-colored MCD and an extended magazine on Co-Conspirator 1's waistband.

  f. UCO-1 explained to Co-Conspirator 1 and MORENO that the UCOs were going to repossess a vehicle using the UCV and that the UCOs had keys to the vehicle they were going to repossess.

  g. UCO-1 asked Co-Conspirator 1 and MORENO to ride in the UCV so that everyone was in one car. UCO-1 told Co-Conspirator 1 and MORENO that the UCOs wanted Co-Conspirator 1 and MORENO to make sure no one approached the UCO while they repossessed the vehicle.

  h. Co-Conspirator 1 replied, "I'm gonna bring this one with me," while holding the Glock pistol affixed with the gold MCD.

15. According to law enforcement reports and the audio video recording, at approximately 2:05 p.m., the following occurred:

  a. Co-Conspirator 1 and MORENO exited the Lincoln SUV and entered the rear seats of the UCV. Co-Conspirator 1 was in possession of the Glock pistol affixed with the gold MCD and MORENO possessed the Draco-style pistol.

  b. UCO-1 drove the UCV to the area of Business A's parking lot near the 3900 block of south Harlem Avenue in Lyons, Illinois.

  c. During the drive, UCO-1 asked Co-Conspirator 1 whether UCO-1 could purchase a "switch" [an MCD] from Co-Conspirator 1.

  d. Co-Conspirator 1 stated Co-Conspirator 1 could get them for "350" [$350] and that they were "metal."

  e. Co-Conspirator 1 explained how "plastic" MCDs did not last because after "10 rounds they burn already." Based on my training and experience

7

and the training and experience of other law enforcement officers familiar with investigating firearms trafficking, and based on my familiarity with the investigation, I believe Co-Conspirator 1 explained that plastic MCDs melt quickly after a gun fires 10 consecutive rounds because the plastic melts due to the heat created by the multiple rounds of ammunition being fired in quick succession.

    f.  UCO-1 then asked Co-Conspirator 1 whether Co-Conspirator 1 knew someone that could install MCDs on firearms, and Co-Conspirator 1 replied, "I get 'em on," and that he could install them in "minutes." Based on my training and experience and the training and experience of other law enforcement officers familiar with investigating firearms trafficking, and based on my familiarity with the investigation, I believe Co-Conspirator 1 confirmed that he could quickly install MCDs onto firearms.

    g.  During the drive, UCO-1 asked Co-Conspirator 1 to sell UCO-1 the Glock pistol affixed with the gold MCD.

    h.  Co-Conspirator 1 laughed and stated "this is personal" and that "this bitch dirty." Based on my training and experience and the training and experience of other law enforcement officers familiar with investigating firearms trafficking, and based on my familiarity with the investigation, I believe Co-Conspirator 1 refused to sell UCO-1 the firearm because Co-Conspirator 1 wanted to keep the firearm for his personal use and because the Glock pistol with the affixed gold MCD had been used in the commission of a crime.

8

      i.      Co-Conspirator 1 then stated he would get UCO-1 "a better one [firearm] with a switch on it."

      j.      UCO-1 asked Co-Conspirator 1 whether Co-Conspirator 1 would be able to sell UCO-1 "smaller" [pistols] or "big" [rifles], to which Co-Conspirator 1 replied that he could get "everything."

      k.      At approximately 2:25 p.m., UCO-1 drove the UCV back to Restaurant A's parking lot, where Co-Conspirator 1 and MORENO exited the UCV, entered the Lincoln SUV and drove away from the area.

16.    Later, on January 15, at approximately 6:15 p.m., UCO-1 placed a recorded call to Co-Conspirator 1's Phone. A male voice, who law enforcement identified as Co-Conspirator 1, answered. UCO-2 asked Co-Conspirator 1 whether Co-Conspirator 1 was available to provide security from the UCOs during another repossession. Co-Conspirator 1 agreed and the call ended.

17.    After the call, Co-Conspirator 1 messaged UCO-2 using Co-Conspirator 1's Phone, and agreed to meet UCO-2 at location, which, unbeknownst to Co-Conspirator 1, was an undercover law enforcement facility in Joliet, Illinois at approximately 8:00 p.m.

18.    According to audio-video recordings, at approximately 7:58 p.m., the black Lincoln SUV entered the undercover location and parked.

19.    After the black Lincoln SUV parked, according to law enforcement reports and the audio-video recording, the following occurred:

9

a. Co-Conspirator 1 exited the driver's seat and MORENO exited the passenger's seat of the Lincoln SUV and entered the undercover facility.

b. Inside, UCO-1 told Co-Conspirator 1 and MORENO that UCO-1 was waiting to confirm the repossession and asked how much time Co-Conspirator 1 and MORENO could wait.

c. Both Co-Conspirator 1 and MORENO lifted their pant legs to reveal electronic monitoring ankle bracelets, and stated they had to return to their respective homes by 9:45 p.m.

d. At approximately 8:06 p.m., UCO-2 asked Co-Conspirator 1 if he still had that, "thing with the button on it," referring to the Glock pistol affixed with the gold MCD.

e. Co-Conspirator 1 replied, "Yeah."

f. UCO-1 asked Co-Conspirator 1 to show the gun to UCO-2, and, in response, MORENO removed a Glock pistol affixed with a gold MCD from MORENO's waistband.

g. MORENO handed the gun to UCO-2, who then pointed to the gold MCD affixed to the back of the pistol and asked, 'This the button right here?"

h. Both Co-Conspirator 1 and MORENO replied "Yeah."

i. UCO-1 showed Co-Conspirator 1 cash and asked MORENO who he should bargain with to purchase the firearm.

j. MORENO motioned toward Co-Conspirator 1 and Co-Conspirator 1 stated, "He [MORENO] knows."

10

      k.      UCO-2 then asked Co-Conspirator 1, "full-auto, right?" and made a noise mimicking the sound of a firearm as fully-automatic gun fire.

      l.      UCO-1 then asked if Co-Conspirator 1 had shot the gun before and he replied "Yeah, it's smooth," referring to the fact that he had fired the gun before in full-auto mode and stated that the recoil was not bad. Co-Conspirator 1 stated he had fired it with a drum magazine attached.

      m.      Co-Conspirator 1 agreed to sell the Glock to UCO-1 for $3,000 and stated he had another gun to "ride home with tonight."

      n.      UCO-1 asked Co-Conspirator 1 if the switch (the MCD) worked and Co-Conspirator 1 replied, "yeah."

      o.      UCO-1 provided Co-Conspirator 1 with $3,000 in prerecorded funds.

      p.      MORENO then gave the Glock, model 21, .45 caliber pistol, bearing serial number NVK677 with an affixed MCD and extended magazine containing 24 rounds of .45 caliber ammunition to UCO-1.

      q.      At approximately 8:28 p.m., Co-Conspirator 1 and MORENO exited the undercover facility, entered the black Lincoln SUV, and left the area after a few minutes.

20. The Glock pistol affixed with the MCD that MORENO handed to the UCOs is depicted below:



### C. February 18, 2026: MORENO admitted he possessed a Glock affixed with an MCD on January 15, 2026.

21. On or about February 18, 2026, at approximately 8:00 p.m., Co-Conspirator 1 and MORENO were arrested by law enforcement at the undercover law enforcement facility in Joliet, Illinois.

22. At approximately 10:15 p.m., after being advised of his *Miranda* rights, MORENO agreed to speak with law enforcement officers and admitted that he knew that an MCD affixed to a pistol allowed the pistol to shoot multiple rounds of ammunition by a single pull of the trigger. MORENO further admitted that he possessed the Glock, model 21, .45 caliber pistol, bearing serial number NVK677 with an affixed MCD on January 15, 2026.

### D. CONCLUSION

23. Based on the foregoing facts, I respectfully submit that there is probable cause to believe that, on or about January 15, 2026, at Joliet, in the Northern District of Illinois, Eastern Division, and elsewhere, Edwin MORENO, did knowingly possess

12

a machinegun, in violation of Title 18, United States Code, Sections 922(o), respectively.

FURTHER AFFIANT SAYETH NOT.

*Daniel Domke*
DANIEL DOMKE
Special Agent, Bureau of Alcohol, Tobacco, Firearms & Explosives

SWORN TO AND AFFIRMED by telephone on February 19, 2026.

_____
Honorable LAURA K. MCNALLY
United States Magistrate Judge